STATE, Plaintiff-Appellee, v. HRYNCZYN, Defendant-Appellant.

Ohio Appeals, Eighth District, Cuyahoga County.

No. 23964.   Decided January 16, 1957.

John T. Corrigan, Pros. Atty., Don DeRocco, Asst., for plaintiff-appellee.

Stephen M. Young, for defendant-appellant.

## OPINION

By SKEEL, J:

This appeal comes to this Court on questions of law from a judgment of guilty and sentence upon the verdict of the jury as charged, the defendant having been indicted for the crime of murder in the second degree.

The defendant claims the following errors:

1) The court interferred with trial procedure by interrogating the witnesses and the defendant.

2) The court erred in making statements as to the evidence not sustained by but contrary to the record.

3) Error in admission and rejection of evidence.

4) Error in overruling defendant's motion to limit the jury's consideration of the case to the charge of manslaughter.

5) Error in not submitting a verdict on assault and battery.

6) Error in the general charge.

7) Error in overruling defendant's motion for new trial.

8) That the judgment is contrary to law and not sustained by suf ficient evidence.

A careful reading of the record discloses that the decedent Robert J Murphy, was a sailor on the Lakes. He did not leave his ship or return to Cleveland until sometime during the latter part of December, 1955 He and his wife had had many difficulties. He had left her on occasions After he returned home in December, he told her he had another gir and that he was leaving her, took his clothes from their apartment and inserted an advertisement in a newspaper that he would no longer be responsible for her debts. The night he got the last of his clothes he returned and demanded the right to look for a pair of shoes. When he was refused admittance, he broke a glass in the storm door trying to get in. The police were called and under their supervision, he was allowed to make a search. He was a heavy drinker and on the night of his death an analysis of his blood showed an alcoholic content (.42%) sufficient to put him in the fourth stage of intoxication (stupor or grogginess).

The defendant met the decedent's wife (Mrs. Murphy) in a bar in September, 1955. He thereafter kept company with her, frequently staying at her apartment overnight until the decedent's return to Cleveland The defendant did not know the decedent and there is no evidence that the decedent had any knowledge of the defendant or his relations with Mrs. Murphy. A day or two before the night of the homicide, the defendant (the decedent having previously left his wife) moved to the apartment with Mrs. Murphy, there being some suggestion in the record that he would marry her after she was divorced. (The defendant testified that he went there to help Mrs. Murphy with the expense.)

There is not the slightest suggestion that the defendant had any previous criminal record.

On the night of the homicide, the decedent went to the home of his wife's sister where he told her he was going to kill his wife and anybody he found with her. The sister called Mrs. Murphy (her sister) and informed her of the threat. At the time of the call, the defendant was at the apartment where he and Mrs. Murphy were watching a television program. As soon as the call warning them of the decedent's threat was received, the defendant and Mrs. Murphy prepared, as quickly as possible, to and did leave the apartment because they were afraid of the decedent. It was agreed that Mrs. Murphy would go upstairs and stay with her neighbor and friend where she could call the police if her husband came to the apartment. The defendant agreed to go to his brother's home a short distance away. (This was where he had lived before he moved in with Mrs. Murphy.) There is some evidence that the defendant and his brother had a gun collection and that he was used to handling guns. He had brought a gun to the apartment (the one used in the homicide) sometime before the night of the homicide, explaining that there had been prowlers in the neighborhood. When they left the apartment, the defendant put the gun (an automatic) in his belt and the clip and

bullets in his pocket. He explained that he took the gun so that the police would not find it. It was not loaded and the clip was put on the seat of the automobile but after a sharp edge caused him some discomfort, he put the clip into the gun. When Mrs. Murphy got upstairs, she discovered that her friend was not home so she returned to her apartment, called her sister to tell the defendant to come back and pick her up and that she would be on the street. The defendant returned as directed and after picking up Mrs. Murphy, they rode around awhile to see if her husband would come to the partment. The defendant testified with regard to their movements and return to the apartment as follows:

"A. Well, I told Laverne that he's probably drunk and he's just bragging and he probably won't come over to the house.

"Q. Was she frightened or not?

"A. Yes, Yes.

"Q. What was said between you about seeing him and if either, if she saw him, about calling the police. What was said?

"A. If we seen him, we were going to call the police.

"Q. And state whether or not the purpose of that was to have him searched?

"A. Yes."

There is no evidence that the defendant was searching for the deceased to engage in any conflict with him or that the gun which was taken along would or was intended to be used if a conflict ensued. In any event, not seeing the decedent in the neighborhood and without knowing he had gained entrance to the apartment by breaking the lock on the front door, they returned.

The door was not locked and was very slightly ajar but Mrs. Murphy said she thought, in her haste to leave, she had neglected to close it. She pushed the door open, took a step or two and reached in to turn on the light located in the bedroom on a chest of drawers to the left when she felt fingers grasp her arm and something like cold steel touch her. Whereupon, she pulled back, ran to the steps, and said "Come on Andy." She then heard Andy (the defendant) say "I am not afraid of that knife. Put it down." "I then seen Andy had the gun. He cocked it like this (indicating) and shot it."

"Q. At the time the gun was shot, what about the light from the lamp?

"A. It was on."

The only other evidence of the shooting comes from the defendant. He said:

"I don't remember, like it is in my statement, who went in the house first, because I was all excited and nervous and everything but all I know is I walked into the house. They say Laverne went in first. * * *

"Well, all I know, I walked in the house with my jacket open, took about two and a half steps or so, reaching in the dark and feeling for the lamp, and I turned on the lamp. My head was down and when I turned the light on, I seen the man standing there. I glanced up and seen the man standing there with a knife in his hand and I believe he said something. I don't know what it was. * * *

"I jumped back and this man came forward at me with the knife in his hand. I just reached in my belt, pulled out the gun, cocked it with my hand on the trigger, cocked it, pulled the trigger and the gun went off.

"I jumped back to the door. Then I noticed the man was bleeding.

"I just held the gun and the man stopped. The man turned toward the dresser, braced himself, looked at me, and didn't say anything. I was just shocked standing there. I didn't know what to do, and the man took a few small steps, pushed himself back and straightened himself up and then took a few small steps and fell down, and I told the man to lay there, I am going to call the police, and I was all excited and everything. The phone was on the little stand and I put the gun on the floor and called the police and told them to send an ambulance. I shot a man.

"When the police came, I told them exactly what took place."

At another place in the record, he said:

"Yes, quickly, I took my hand away from the lamp and reached in my pocket, pulled out the gun, cocked it and shot. I didn't aim or nothing."

And again he said:

"Q. And how long did that entire thing take?

"A. A matter of seconds.

"Q. And in that instant of time, do you recall whether you did say anything about the knife?

"A. Well, 'Put down the knife. I'm not afraid of it.'

"Q. Do you recall that?

"A. I remember something about it, but I don't know if that is the actual words or not, but I know I said something about a knife.

"Q. Were you afraid of the knife? Were, at the time, were you afraid of your life?

"A. At the time, I was."

The deputy coroner testified that the decedent was sixty one inches (5'1") tall; that the bullet entered the defendant's body 28½ inches above the heel in a downward course. Quoting from the record, he testified as follows:

"* * * That bullet entered his right groin about here (indicating), right below the ligament here, passed through his thigh from above, slightly downward, struck the right femoral artery, which is the blood vessel which carries nourishment to the leg, tore it almost completely, and made its exit from back of the thigh."

When the police arrived, they found the knife, which the decedent must have taken from the kitchen before his wife and the defendant reached the apartment, on the dresser in the exact position the defendant testified it had been put by the decedent before falling to the floor.

The first claim of error is not well taken. A trial judge is within his judicial power to interrogate a witness so long as he stays within matters that are relevant and does not by his inquiries show or even suggest that he holds views favorable to one side or the other—so that the evidence, and not the judge's attitude in asking questions, is the only basis for the jury's verdict.

The case cited by the defendant on this question is **State v. Lawrence, 162 Oh St 412,** 123 N. E. (2d) 271, and is authority for the rule that the trial judge should not go beyond the bounds of propriety during a trial and cites Canon 15 of Judicial Ethics to the effect that:

"A Judge * * * should bear in mind that his undue interference, impatience or participation in the examination of witnesses or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause or the ascertainment of the truth in respect thereto."

The record shows that the court stayed clearly within the bounds of this Canon. We also find that there is no substance to the second and third claims of error. The fourth assignment of error is considered at a later time in this opinion. The fifth claim of error is that the court should have charged on assault and battery.

There is no dispute but that the decedent came to his death as the sole and proximate result of the gunshot wound inflicted by the defendant. This entirely disposes of any contention that the court should have charged on assault and battery.

As to the sixth claim of error, we find the charge of the court on the subject of self-defense is not entirely free from criticism. The statement that the first element of self-defense is that the defendant must be free from fault should have been limited to fault in bringing about the altercation in which the defendant had to act in self defense. However, the defendant did not call this claim of error to the attention of the court, entering only a general exception. Under the facts in the case, we do not believe the defendant was prejudiced in any way by the charge.

Coming now to claims of error nos. 4, 7 and 8, as above enumerated.

We have been careful to set forth with considerable detail the evidence of the facts and circumstances leading up to the death of Robert J. Murphy. There is no doubt at all in the record but that the decedent came to his death as the direct result of a gunshot wound inflicted by the defendant. The only question, therefore, is whether the defendant acted then and there purposely to kill the decedent. On this question, we find that there is not sufficient evidence, under all the circumstances, to sustain this element of the state's case. There is no direct evidence, except the discharge of the gun, as indicating a purpose to kill. The circumstances, as shown by the record, would negative an inference of such purpose, usually to be inferred by the use of a deadly weapon. In support of the defendant's statement "I didn't aim or nothing," the statement of the coroner as to the place where the bullet entered the body and its downward course thereafter would indicate that the defendant did not aim at the decedent before discharging the gun. The defendant was one experienced in the use of guns. The manner of the use of the gun, under the circumstances in this case, decedent and defendant being within two feet of each other at the time, are factual matters which, without other proof, would mitigate against the state in its attempt to establish beyond reasonable doubt the necessary element of purpose to kill in a case of murder in the second degree.

486

We invoke the power vested in a reviewing court to modify the degree of crime of which the defendant has been found guilty where the offense charged has within it elements of a crime of lesser magnitude and the evidence does not support the principal crime charged but is sufficient to make out an offense within the principal crime charged.

**Paragraph D** of §2945.79 R. C., provides:

"That the verdict is not sustained by sufficient evidence or is contrary to law; but if the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lessor degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and pass sentence on such verdict or finding as modified, provided that this power extends to any court to which the cause may be taken on appeal."

The question of self-defense having been properly submitted to the jury and their verdict indicating that the defendant failed to sustain that issue by the proper degree of proof, we, therefore, proceed to modify the degree of guilt from murder in the second degree to manslaughter in the first degree, and as modified, the judgment affirmed and the cause remanded to the common pleas court for sentence as provided by law. Exceptions noted. Order see journal.

KOVACHY, PJ, HURD, J, concur.